# DAVID GIBSON *et al.*

## *v.*

# JAMES H. REES *et al.*

1.  ASSIGNMENT FOR THE BENEFIT OF CREDITORS—*what interest will pass thereby— and of a resulting trust in favor of creditors.* A debtor made an assignment of his property to a trustee for the benefit of his creditors,—prior to making the assignment the debtor had purchased of the trustees of the Illinois and Michigan Canal, a number of lots, which had been laid out on the canal lands. He had paid a part of the purchase money but was in default in the payment of the balance, and by the terms of the purchase, the trustees of the canal had, as the agents of the State, the right to declare a forfeiture of the contract, and retain the purchase money already paid. These lots were embraced in the deed of assignment, and that was the condition of the title at the time such deed was made. The State, however, did not avail itself of the right to declare a forfeiture, but by an act of the legislature permitted purchasers of canal lands, thus situated, to apply the purchase money which had been paid, upon a portion of the premises purchased, and thereby to acquire a title to such portion, releasing the residue of the lands purchased to the State. The trustee, under the deed of assignment, availing himself of this privilege, applied the purchase money which had been paid by the debtor, upon a portion of the lots purchased, and obtained a patent from the State to the portion so paid for, and released the residue to the State : *Held,* that at the time of the assignment, the debtor had such an interest in the lots so purchased by him, as could be transferred by the deed, and as to such portion of the lots as the trustee obtained a title to, by such application of the money which had been paid by the debtor, a trust would result to the creditors under the assignment.

2.  SAME—*of the right to make an assignment and to prefer creditors.* The owner of property has the legal right to assign all his property and effects, to another in trust for the benefit of his creditors; and in the exercise of such legal right, he may lawfully prefer creditors.

3.  SAME—*of the binding effect of the assignment, and of its revocation.* When the trust is accepted under such an assignment and the trustee enters upon its execution, so long as it remains in force, or where the creditors are parties to the instrument, or have presented their claims to the trustee, and have given him notice that they look to the trust fund for payment, the deed of assignment is binding upon all the parties in interest, and a court of equity will enforce the trust.

4.  But, where a deed of assignment is made to which the creditors do not become parties, the powers conferred upon the trustee may be revoked and the

trust destroyed, by an arrangement between the grantor and trustee to that effect, but to be valid it must be done before the creditors under the deed of trust have assented to its conditions, or have done any act entitling them to rely upon the fund so created for the payment of their claims.

5. SAME—*assent of creditors—presumption thereto.* Where a deed of assignment for the benefit of creditors has been executed and recorded, it will be presumed the creditors for whose benefit it was made assented thereto.

6. But such presumption may be rebutted by proof of the refusal of the creditors to accept the provisions of the trust, or by prolonged and unreasonable delay on their part, in any attempt to avail themselves of its benefits.

7. So, where the creditors for whose benefit an assignment was made, remained inactive for eight years thereafter, and the trust was then revoked by an arrangement between the debtor grantor and the trustee, and such creditors continued to remain inactive for nearly thirteen years after the revocation, such prolonged inaction would overcome all presumption of assent to the terms of the assignment on the part of the creditors, and the revocation of the trust will be sustained, so as to preclude the creditors or their assignees from afterward asserting any claim under the trust.

8. LIMITATIONS—*as applied to the enforcement of a trust for the benefit of creditors.* Where the creditors for whose benefit an assignment is made, delay asserting any claim to the trust fund for such length of time, that the debts designed to be secured would be barred by the statute of limitations, it would be the duty of the trustee after such lapse of time to refuse to pay the debts, and a court of equity will refuse to enforce the trust.

9. CHANCERY—*of a pro confesso decree—effect of filing an amended or supplemental bill.* Where a *pro confesso* order has been made, the effect of filing an amended or supplemental bill, after such order has been taken, is to vacate the the order, and the defendants are admitted to answer as though a decree *pro confesso* had not been taken.

10. SAME—*interlocutory decretal orders—how far conclusive upon a final hearing.* By the modern practice, on the final hearing of a suit in chancery, all previously rendered decretal orders are before the court and may be altered, modified or vacated, as justice may require.

APPEAL from the Superior Court of Chicago.

The opinion states the case.

Messrs. BECKWITH, AYER & KALES, for the appellants; Mr. T. D. LINCOLN, for appellant GIBSON; Mr. J. A. ORAM, for appellants BRYAN & PARKER.

Mr. JAMES L. STARK, for appellee REES ; Messrs. BORDEN & SPAFFORD, for appellees CASEY & YOUNG ; Messrs. DENT & BLACK, for appellee LOUISA C. ELLIS.

Mr. JUSTICE WALKER delivered the opinion of the Court:

On the 13th day of August, 1855, David Gibson, on behalf of himself and all other persons, or their legal representatives, who were, on the 9th day of January, 1838, creditors of Henry King, filed his bill in the Cook County Court of Common Pleas, against Hannah Eldridge, Edward Eldridge, Jr., Helen Eldridge, Henry Eldridge, Constance Eldridge and Harriet Eldridge—the widow and heirs at law of Edward Eldridge, senior—and Ann G. King, Julia King, Susan M. King, Henry King, Harriet A. King, Edward P. King and Thomas P. King—the widow and heirs at law of Henry King, deceased, for the purpose of enforcing the payment of certain claims against lot six, in block thirty-four, and the east half of lot six, in block thirty-eight, in the original town of Chicago. The claims mentioned were alleged to be a lien upon the premises by virtue of a deed of assignment of Henry King to Edward Eldridge, senior, dated January 9th, 1838, conveying the premises mentioned, with other property, to Eldridge, senior, for the benefit of King's creditors.

On the 9th day of April, 1856, the bill was dismissed as to Julia King, Susan M. King, Henry King, Harriet A. King, Edward P. King and Thomas P. King, and as to the east half of lot six, in block thirty-eight, above named.

An appearance having been entered by the other parties on the same day, the bill was taken *pro confesso* against them for want of an answer, and it was ordered that the defendants, Edward Eldridge, Hannah Eldridge, Helen Eldridge, Henry Eldridge, Constance Eldridge and Harriet Eldridge, convey to Robert S. Blackwell, as a trustee, whatever title to said lot six, in block thirty-four, came to them by descent from their ancestor, Edward Eldridge, senior, and in default of their so doing

that such conveyance should be executed by a commissioner. Mr. Blackwell was directed to sell and convey the premises and report to the court, and all persons having claims against Henry King on the 9th day of January, 1838, or their representatives or assigns, were allowed to prove the same and their title thereto before the master within three months from the date of said order, of which notice was to be given by publication.

On the 28th day of March, 1857, the time allowed for proving claims against Henry King was extended to May 9th, 1857.

On the 14th day of July, 1857, Edward G. Hyde presented to the master a claim against Henry King, as indorser of three promissory notes of Reynolds, Jenkins & Lovell, dated November 3d, 1836, for $3,685.79, $3,808.29 and $3,930.79 respectively, payable to Henry King or order, and by him indorsed; which claim was on the 15th day of July, 1857, assigned to James H. Rees.

On the 14th day of July, 1858, it was ordered that Robert S. Blackwell, Esq., theretofore appointed trustee in the cause, do desist and refrain from taking any action whatever as such trustee, and especially from taking any step or proceeding whatever with reference to the sale or other disposition of the premises, or in any manner interfering with the same.

On the 24th day of May, 1859, on motion of Edward G. Hyde, the time for presenting and proving claims against King was further extended to August 22d, 1859, of which notice was to be given by publication. The same order allows Mr. Blackwell to demand a conveyance of the premises from the widow and heirs of Eldridge, and prescribes the manner of so doing, and directs, in default of compliance with such demand, that a deed be made by Freer, as commissioner.

Notice, by publication of the above order, was given May 31st, 1859.

On the 16th day of July, 1859, Henry Young, survivor of Henry Thomas, assignees of James N. Hyde, presented to the

master a claim against Henry King for a balance of account due from him to Simeon Hyde, and by said Simeon Hyde assigned to James N. Hyde.

On the 23d day of July, 1859, Isaac L. Hunt presented to the master claims against Henry King, originally in favor of Suydam, Jackson & Co., J. H. Ransom, McNulty & Chapman, Pomeroy & Bull, S. P. Church & Co., Joseph D. Beers *et al.*, White & Richards, J. D. Disosway & Bro., and as endorser of two notes of J. W. C. Coffin, indorsed by said King. Hunt asserted the claims under assignments alleged to have been then lately made by said creditors of King or their representatives.

The interest of Hunt in these claims was afterwards, on the 12th day of November, 1859, assigned to Abraham G. Jennings, who assigned the same to Louisa Compton, now Louisa C. Ellis, on the 6th day of January, 1860.

On the 13th day of October, 1859, and on the 12th day of November, 1859, James H. Rees procured from W. C. H. Waddell, assignee in bankruptcy of S. P. & J. R. Church, assignments of the claim of S. P. Church & Co. against Henry King. ·

On the 29th day of November, 1859, Freer, as special commissioner, conveyed the premises to Robert S. Blackwell.

On the 22d day of December, 1859, James H. Rees procured an assignment from the Illinois College of a claim against Henry King, on an alleged subscription claimed to have been made by him on the 5th day of July, 1836, for the benefit of that institution.

On the 13th day of January, 1860, James H. Rees filed a petition to become a party complainant in the cause, and by order of court he was so made. At the same time leave was granted him to file a supplemental bill, which was filed August 31st, 1860.

The supplemental bill of Rees sets forth the allegations of the original bill, the orders and proceedings in the cause, and particularly the claim of Rees against Henry King as indorsee

of the notes of Reynolds, Jenkins & Lovell, and the claims originally in favor of S. P. Church & Co. and the Illinois College. The bill seeks to charge the east half of lot six, in block thirty-eight, as well as the other premises, with the payment of King's debts, and for that purpose Thomas B. Bryan and J. Mason Parker, the holders of the legal title to the east half of lot six, in block thirty-eight, and James Lorimer Graham, Esther Ann Callett, and Samuel D. Parker, who claimed a lien upon the premises last mentioned, under Thomas B. Bryan and J. Mason Parker, were made parties. The bill further alleged that Gibson had taken possession of lot six, in block thirty-four, and was then in possession of the same by his tenants, who were made parties. It also alleged that Eldridge and Gibson had severally received large sums of money as rents and profits, and prayed an account thereof and a decree for the same. A receiver, and an injunction restraining Mr. Blackwell from intermeddling with the premises, were prayed for. Answers to this supplemental bill were filed by Gibson, October 19th, 1860, and by Bryan and J. Mason Parker, December 20th, 1860, to which replications were filed.

The answer of Gibson asserted an absolute title to lot six in block thirty-four, derived under Henry King, and the widow and heirs of Eldridge, senior, and while it asserted Gibson's ownership of the claims mentioned in the original bill, it insisted that the premises were not chargeable with the debts of King, or with the trusts of his assignment. The title of Gibson is alleged to have been derived in the following manner, viz:

On the 4th day of March, 1843, Henry King was declared a bankrupt by the District Court of the United States for the Southern District of New York, and W. C. H. Waddell was appointed his assignee in bankruptcy. On the 15th day of July, 1845, Waddell, as assignee in bankruptcy of Henry King, conveyed to Gordon L. Ford all of King's interest in the premises. Ford was not a party to the original bill and

afterwards, on the 2d day of March, 1860, he conveyed all his interest in the premises to the defendant, Gibson.

On the 28th day of July, 1855, and prior to the filing of the original bill, the widow and heirs of Eldridge made a contract in writing with Zenas Cobb, Jr., to convey to him lot six in block thirty-four, and Cobb was not made a party to the original bill. On the 19th day of September, 1857, and after the filing of the original bill and the decree *pro confesso* therein, Cobb fully performed the above contract on his part and assigned his interest therein to David Gibson, to whom the widow and heirs of Eldridge conveyed the premises by deed of the same date. The possession of the premises had been delivered to Gibson by Cobb, who obtained the same from the widow and heirs of Eldridge.

The answers of Thomas B. Bryan and J. Mason Parker asserted an absolute title to the east half of lot six, block thirty-eight, derived under an agreement between Henry King and Edward Eldridge, senior, dated October 15th, 1845, and a conveyance of King's interest under the same to Amory Gamage, dated April 5th, 1849. The specific performance of the above agreement was decreed in a suit of Gamage against the widow and heirs of Eldridge, and a deed is alleged to have been executed to Gamage in pursuance of such decree, under whom Bryan and J. Mason Parker claimed title.

On the 20th day of December, 1860, the court appointed Zenas Cobb, Jr., receiver of lot six, block thirty-four, and restrained Gibson from conveying the premises.

On the 12th day of October, 1863, Henry Young, survivor of Henry Thomas, assignees of James N. Hyde, filed an affidavit in the cause, asserting a claim against Henry King as indorser of the notes of Reynolds, Jenkins & Lovell before mentioned, adverse to the claim of James H. Rees upon the same notes.

On the same 12th day of October, 1863, Henry H. Casey filed an affidavit in the cause, asserting a claim as the survivor of Christopher S. Hubbard against Henry King. On the 16th

day of November, 1863, on motion of Henry Young, the time allowed for presenting and proving claims was extended to January 1, 1864.

On the 5th day of July, 1864, Louisa Compton, now Louisa C. Ellis, filed an affidavit in the cause, asserting claims against Henry King, originally in favor of Hasbuck & Buck, and Pomeroy & Bull, which she claimed under assignments then lately made.

On the 14th day of July, 1864, the time for presenting and proving claims was further extended to September 1st, 1864.

On the 5th day of March, 1866, it was ordered that all persons having claims against Henry King should appear in court and become parties to the suit on or before the 15th of March, 1866, or be forever barred from any benefit of the same; which order was, on the 7th of March, 1867, modified so as not to preclude Louisa C. Ellis, Henry Young and Henry H. Casey from whatever relief they might be entitled to.

On the 10th of May, 1863, Robert S. Blackwell died intestate, leaving him surviving Catharine R. Blackwell, his widow, and Orville B. Blackwell and Kate Blackwell, his children and heirs at law. A nominal title to lot six, block thirty-four, is vested in Mr. Blackwell's heirs; but they do not claim any interest therein.

On the 6th day of October, 1865, David Gibson conveyed the premises last mentioned to Thomas B. Bryan, who, on the 9th day of October, 1865, conveyed a portion of the same to Maurice H. Merriman.

On the 7th day of March, 1867, leave was granted to David Gibson to file a supplemental bill against Catharine R. Blackwell, Orville B. Blackwell, Kate Blackwell, James H. Rees, Henry H. Casey, Louisa Compton, Henry Young, Thomas B. Bryan and Maurice H. Merriman, which was filed on the same day.

This bill sets forth the original bill and the allegations therein contained; the subsequent pleadings, orders and

proceedings in the cause; the death of. Mr. Blackwell, leaving him surviving Catharine R. Blackwell, his widow, and Orville B. and Kate Blackwell, his children and heirs at law; the conveyance by Gibson to Bryan, and by Bryan to Merriman; and prays for such relief as the complainant may be entitled to. To the supplemental bill of Gibson, answers were filed by James H. Rees, Henry Young, Henry H. Casey, Louisa C. Ellis, Thomas B. Bryan and Maurice H. Merriman; to which answers replications were filed. David Gibson never presented any claims against King for allowance, and on the 13th of January, 1868, in open court, during the hearing of the cause, declined further to prosecute the suit on behalf of himself as complainant, or for the creditors of Henry King; and thereupon leave was given to James H. Rees to prosecute the same on behalf of himself, Louisa C. Ellis, Henry Young and Henry H. Casey.

The persons last mentioned assert that certain alleged liabilities of Henry King are liens upon lot six in block thirty-four, and the east half of lot six in block thirty-eight, in the original town of Chicago; and a more detailed statement of the title of the defendants will explain the nature and origin of the alleged lien of the claimants.

In 1836 Henry King purchased of the Board of Commissioners of the Illinois and Michigan Canal, lot six in block thirty-eight, lot seven in block twenty-eight, lot four in block forty-six, and lot four in block thirteen, all in the original town of Chicago, and became the assignee of one William Young of his right and title to lot six in block thirty-four in the original town of Chicago, purchased by said Young of the Board of Commissioners of the Illinois and Michigan Canal. King received the usual certificates of purchase of the lots purchased by him, and became the assignee of a like certificate issued to William Young. The purchase money of the lots was eighteen thousand and thirty dollars, payable, one-fourth part in cash and the residue in one, two and three years,

with interest at six per cent., payable annually in advance on the unpaid portion of the purchase money. The contracts of purchase were to be forfeited if the residue of the purchase money and the interest thereon was not promptly paid. The first payment, amounting to forty-five hundred and seven dollars and fifty cents of principal, and eight hundred and eleven dollars and thirty-five cents interest, was made, but the subsequent payments were none of them made at the time they became due, and all of said lots were, in the year 1837, forfeited to the State. The law under which the forfeiture occurred made it absolute. On the 9th day of January, 1838, Henry King made an assignment to Edward Eldridge, senior, of the above named lots, with other property, for the benefit of his creditors. The assignee was authorized to sell and convey the assigned property, and was required to pay out of the proceeds, first, certain liabilities mentioned in schedule A annexed to the assignment; and second, the liabilities mentioned in schedule B thereto annexed, which enumerated certain ones, and referred to others under the description of " any other lawful and just demands against said Henry King not then stated in his indebtedness."

None of the claims asserted in this suit are mentioned in schedule A, excepting the claim presented by Henry H. Casey, which is described as a claim in favor of Hubbard & Casey of between $4,500 and $5,000, on which a suit had been commenced against said King, wherein Thomas M. Grosvenor and Henry Eldridge had become bail for him. By the assignment a preference was given to Thomas M. Grosvenor and Henry Eldridge for any amount they might be obliged to pay by reason of their liability as bail; but no preference was given to the debt itself, nor to Hubbard & Casey on account thereof; and no provision was made for its payment excepting the direction to pay " any other lawful and just demands against said Henry King not then stated in his indebtedness."

The following asserted claims are mentioned in schedule B :

Balance due to Pomeroy & Bull,................$1,800.00

"          "     J. H. Ransom,...................   200.00

"          "     S. P. Church & Co., .............  1,224.20

Any balance which may be due to Simeon Hyde, on settlement of accounts with him.

No mention is made in either of the schedules of any liability of King to the Illinois College, or any liability as indorser of the notes of Reynolds, Jenkins & Lovell. The claims presented by Louisa C. Ellis, originally in favor of Hasbuck & Buck, J. D. Disosway & Bro., J. D. Beers & Co., White & Richards, Suydam, Jackson & Co., McNulty & Chapman and as indorser of the notes of J. W. C. Coffin, are not alluded to in the schedules.

At the time the assignment was made the State was the absolute owner of the premises, without any right of redemption or claim to relief on the part of King. The General Assembly of Illinois, in consideration of the depreciation of the value of canal lots and lands, and of the severe losses sustained by purchasers thereof, by an act entitled, "An Act for the relief of purchasers of canal lots in Chicago and Ottawa in 1836," approved February 27th, 1841, authorized a re-sale of canal lands and lots theretofore sold and forfeited to the State, whereon advances had been made to the State by way of payment therefor, at a valuation of sixty-six and two-thirds per cent. of the original price. Such re-sales were authorized to be made to original purchasers only, but the right of purchase thereby granted was made assignable by an instrument in writing, to be filed and recorded by the Board of Commissioners of the Illinois and Michigan Canal. Purchasers were allowed to make a selection from the forfeited lands and lots, of those which they desired to purchase, and to pay the new valuation by deducting payments already made thereon, and surrendering certificates of sale of other lands, lots or parts of lots, sold and forfeited. Prior to, or soon after the passage of this act, Henry King assigned and delivered to Edward

Eldridge, senior, the certificates of sale of the five lots originally purchased of the Illinois and Michigan Canal, but it does not appear that Eldridge made any effort to use them until after King had filed his petition in bankruptcy. On the 4th day of March, 1843, King was declared a bankrupt by the District Court of the United States for the southern district of New York, and all of his property and rights of property passed to W. C. H. Waddell, the official assignee of that district.

On or about the 17th day of May, 1843, Edward Eldridge, senior, relinquished to the State said lot seven, in block twenty-eight, lot four, in block forty-six, and lot four, in block thirteen, and applied the sums paid thereon towards the purchase of said lot six, in block thirty-four, and the east half of lot six in block thirty-eight. Eldridge paid the State the further sum of $604.49, being the residue of the purchase money of the premises last mentioned, and afterwards, on the 9th day of June, 1843, received patents for the same. On or about the 19th day of May, 1843, Eldridge sold the west half of lot six, in block thirty-eight, to Benjamin Jones. In the year 1843, Eldridge, senior, took possession of lot six, in block thirty-four, which he, by his tenants, retained until July, 1846, when Edward Eldridge, junior, under some claim of title which does not appear, took possession, which, by his tenants, he, for himself, or for himself and those jointly interested with him, retained until July 28th, 1855, when he and the other heirs of Eldridge, senior, sold the premises to Zenas Cobb, junior. On the 3d day of February, 1845, King obtained his discharge in bankruptcy, and on the 15th day of October, 1845, Eldridge, senior, and King entered into an agreement, reciting that the title to the premises under the assignment had failed, and that Eldridge had acquired a title thereto independent of the trusts of that instrument and by which Eldridge agreed to convey to King the east half of lot six in block thirty-eight, upon the payment of five hundred dollars in six months, and also to convey lot six, in block thirty-four upon payment of five thousand dollars within two years. If the payments were

not made as stipulated, it was agreed that Eldridge should have the property absolutely. The agreement further recited that all claims mentioned in King's assignment, having priority of that of Eldridge, excepting the claim of Nancy A. King, had been discharged. It appears that Nancy A. King, on the same 15th day of October, 1845, released to Edward Eldridge, senior, all claims which she had under Henry King's assignment. Edward Eldridge, senior, died September 8th, 1847, within the two years mentioned in his agreement with Henry King, leaving minor heirs surviving him. Henry King died in the year 1850, without having in any manner complied with the provisions of his contract with Eldridge, senior, and on the 14th day of August, 1854, the widow and heirs of King conveyed all their interest in lot six, block thirty-four to David Gibson. On the 15th day of July, 1845, Waddell, as assignee in bankruptcy of Henry King, conveyed to Gordon L. Ford all King's interest in the premises, and on the 28th day of July, 1855, Hannah Eldridge, Edward Eldridge, junior, Helen Eldridge, Henry Eldridge, Constance Eldridge and Harriet Eldridge, the widow and heirs of Edward Eldridge, senior, sold, by contract, lot six in block thirty-four, to Zenas Cobb, junior, who gave his notes for the purchase money and has since paid them. The tenants in possession immediately attorned to Cobb, and he remained in possession, under the title derived from the heirs of Eldridge, senior, until he sold the premises to David Gibson. Prior to the 13th day of August, 1855, Gibson had acquired by assignment the claims of certain creditors against Henry King, and on that day, he for himself and all others having like claims, filed the original bill, but neglected to make Gordon L. Ford, who had acquired the interest of Henry King, and Zenas Cobb, junior, who was in possession and had acquired the title of the heirs of Eldridge, senior, parties to the suit. Afterwards, on the 19th day of September, 1857, Gibson acquired the title of Cobb and took possession of the premises, and on the 2d day of March, 1860, acquired the title of Gordon L. Ford.

Eldridge, senior, by an agreement with Henry King, dated October 15th, 1845, agreed to convey to him the east half of lot six in block thirty-eight, upon payment of five hundred dollars within six months. Eldridge, senior, died September 8th, 1847, leaving a widow and minor heirs surviving him. On the 5th day of April, 1849, Henry King and Nancy A. King, one of the creditors mentioned in Henry King's assignment, conveyed all their interest in the east half of lot six in block thirty-eight, to Amory Gamage. On the 14th day of April, 1852, Amory Gamage filed a bill in chancery against the widow and heirs at law of Eldridge, senior, to redeem the east half of lot six in block thirty-eight, alleging that the agreement between King and Eldridge, of October 15th, 1845, was a mortgage; and on the 18th day of August, 1853, a decree was obtained allowing a redemption. The redemption was made and the master in chancery in pursuance of the decree, on the 9th day of February, 1854, conveyed the premises to Gamage, under whom the defendants Bryan and J. Mason Parker claim title by absolute conveyances. Until that time the premises last mentioned were vacant and unoccupied. The original bill of Gibson, filed August 13th, 1855, sought to charge these premises with the payment of King's debts, but was dismissed as to the same, April 9th, 1856. The supplemental bill of James H. Rees again sought to charge the premises last mentioned with the alleged trust, and for that purpose Bryan and J. Mason Parker, the holders of the legal title, were made parties. The supplemental bill of Rees also sought to charge the title to lot six in block thirty-four, which Gibson had, after the filing of the original bill and the order taking the same *pro confesso*, acquired of Gordon L. Ford and Zenas Cobb, junior, and the rents and profits of the last mentioned premises, with the same trust. Bryan and Merriman have succeeded to Gibson's title to lot six in block thirty-four, and Gibson has abandoned his claim as a creditor of King. The creditors who are prosecuting the suit, are seeking to establish their claims as liens upon the premises, and Gibson

and those claiming under him are resisting them, claiming that they have an absolute title not subject to the alleged lien. Bryan defends his title to the east half of lot six in block thirty-eight on the same grounds. This statement of the facts is sufficiently full for an understanding of the various questions presented by this voluminous record.

That Henry King had the legal power to make an assignment of all his property and effects for the benefit of his creditors, no one will question. And it is equally clear that in doing so, he had the right to prefer a portion rather than others. Such a power has long been recognized by the courts of both Great Britain and this country. When such an instrument is made and the trust accepted and the trustee enters upon the discharge of the trust, so long as it remains in force, or where the creditors are parties to the instrument, or have presented their claims to the trustee and given him notice that they look to the fund for payment, it is binding upon all parties in interest, and a court of equity will entertain jurisdiction and carry the trust into effect. But to have force and validity it is necessary that it be entirely free from fraud in its inception and purposes.

It appears that King, prior to the 9th of January, 1838, the date of this assignment, had purchased of the trustees of the Illinois and Michigan Canal, a number of city lots, which had been laid out on canal lands, and of which the property in controversy formed a part. He had paid a part of the purchase money, but was in default in the payment of the balance, and by the terms of the purchase the trustees of the canal had, as the agents of the State, the right to declare a forfeiture of the contract and retain the purchase money already paid. But this record fails to show that the State exercised this right, but on the contrary, the general assembly in February, 1841, passed an act, which, in consideration of the great depreciation of property and the heavy losses sustained by purchasers of canal lands and lots upon which a portion of the purchase money had been paid and a balance

remained unpaid, gave them the right to appropriate the payments made on several tracts to the discharge of the purchase money of such portion of the lands purchased as it would satisfy, and to release the remaining lands to the State.

Under this enactment, Eldridge availed himself of its provisions, and the property was re-valued as the law required, and King endorsed the certificates of purchase to Eldridge, and he, as such assignee, released the other lots and applied the money already paid, to the lots in controversy, and acquired in his own name a patent therefor from the State, and thus became vested with the fee. Eldridge did not, however, make this arrangement until in May, 1843, after King was declared a bankrupt under the laws of the United States.

It is earnestly urged, that this property, with the title thus perfected, never became subject to the trust declared in favor of King's creditors; that at the time of the assignment, as King was in default, and had no right to, nor could he have enforced his contract with the canal commissioners, by embracing the lots in his deed of assignment, passed no title either legal or equitable to Eldridge for the benefit of the creditors, and that when Eldridge obtained the title to the property in controversy, it was under a new and independent contract with the State, and that in law or equity no interest inured to the benefit of the creditors. It is no doubt true, that the creditors, or Eldridge for them, could not have rendered the interest conveyed by King to Eldridge, available to the five lots, unless they had paid the balance of the purchase money, which, in its then depreciated condition, would doubtless have been of many times its value at that time. This no one would think of doing; but on the contrary, in obtaining the title under the act of the legislature, Eldridge did not pay for the land, but simply availed himself of the payments already made by King, and for whose benefit, with others, the law was adopted.

In making this arrangement, Eldridge, who held the title, in equity, to King's contract with the State, and it was in trust

for the benefit of King's creditors, when he used the pay-
ments made by King to perfect the title to the land embraced
in the trust, was but carrying out in good faith the intention
of King and himself when the trust was created, and inde-
pendent of covenants in the deed of assignment, a trust
resulted to the creditors when Eldridge thus obtained the fee.

In equity, it was for the benefit of the creditors, and it was
but carrying out King's intentions implied from his convey-
ance of these lots. Had he regarded the purchase of these
five lots as canceled and the purchase rescinded, why embrace
them in the deed of assignment? Had Eldridge been able to
obtain the return of the purchase money from the State instead
of a part of the lots, would any one pretend that it was not,
under the deed of assignment, a part of the trust property?
We presume not. Had the State declared a forfeiture and
retained the money already paid, and King or Eldridge had
then re-purchased the lots and paid their own money and not
the trust money, then the position of counsel would no doubt
be correct and applicable; but King had assigned this claim
against the State for the benefit of his creditors, and so far as
it was realized, a trust resulted for their benefit.

It would be inequitable to permit the trustee to thus appro-
priate the trust fund to the exclusion of the other creditors,
when he had not paid for it, and King was estopped by his
deed from thus applying it, while the trust was still in force
and binding. A court of equity would not permit such a
misappropriation of a trust fund, but will hold parties to fair
and honest dealings with it.

It is, however, urged by appellants' counsel, that the
arrangement manifested by the written agreement, entered into
by Eldridge and King on the 15th of October, 1845, in terms,
as well as in law, revoked the power conferred upon Eldridge
by the deed of assignment, and that the trust thereby created,
ceased and was terminated, and creditors thenceforth had no
further interest in or claim upon the property. That a power
created by a deed of this character may be revoked and the

trust destroyed by an arrangement between the grantor and trustee, we think there can be no doubt. But to be effectual it must be done before the creditors have manifested their assent by presenting their claims to the trustee, or in some manner manifest their assent or do some act entitling them to rely upon the fund for payment of their claims.

This seems to be the well recognized doctrine of the British courts. In the case of *Acton* v. *Woodgate,* 2 Mylne & Keen, 492, it was held that a conveyance of property by a debtor in trust for the benefit of creditors, who are not parties or privies to the deed, only operates as a power for the trustee to apply the property in payment of such debts; and that the power is revocable by the debtor. That it has but the same effect as if the debtor had delivered money to another with which to pay his debts, and which he might withdraw at any time before it should be thus applied, or the fact communicated to the creditors that it was thus held by the agent for their use. In that case, *Ganard* v. *Lauderdale,* 3 Sim. 1, was referred to as holding the revocation might be made, notwithstanding the trustee had communicated the fact to the creditors, but the Master of the Rolls questioned that doctrine. The case of *Walywn* v. *Coutts,* 3 Meriv. 707, and the same case in 3 Sim. 14, went further, and held, that although the solicitor of the trustee and the debtor had sent a circular letter to the creditors, notifying them of the assignment and its nature, the creditors had no right, notwithstanding the notice, to enforce the deed against the representatives of the grantor, inasmuch as they had not signed the deed. The case was appealed to the chancellor and affirmed. In *Paige* v. *Broom,* 4 Russ. 6, a similar question was before the court. A debtor had by a deed poll, directed the receiver of his estate to pay the interest of a particular mortgage; and it was held, that as the deed was executed without the privity of the mortgagees, and without consideration on their part, it was not binding upon the grantor.

In the case of *Wilson* v. *Pearson,* 20 Ill. 81, it was held, that the parties to a trust deed for the benefit of creditors,

might abandon the assignment and trust before the rights of creditors had intervened, and that whether it had been abandoned was a question to be determined from all the circumstances surrounding the transaction.

Again, in the case of *Pierce* v. *Brewster*, 32 Ill. 268, it was held that an agreement by the debtor and trustee entered into subsequently to the assignment, that the latter should not sell the property assigned, on a credit, as he had been authorized by the deed of assignment, was valid and purged the deed of the fraud which the law inferred from such a power, and rendered the assignment valid and binding.

These authorities abundantly establish the doctrine that when such a deed is made and the creditors are not parties to it, it may, under proper limitations, be altered, changed or canceled by the parties to the instrument.

It remains to determine whether in this case the revocation of the trust was accomplished by the agreement of the 15th of October, 1845. While we might not be willing to adopt the rule announced by the British courts in its full length and breadth, still with reasonable qualifications we are prepared to give it application. While we might, in accordance with the rule adopted in some American courts, hold that when such a conveyance is executed and recorded, we would presume the assent of the creditor, as it would appear to be for his benefit, yet we must hold that such a presumption is liable to be rebutted; and that it would be rebutted by proof that the creditors had refused, upon learning of the conveyance, to avail themselves of its provisions; or if they should delay for a length of time, so long as to create a counter presumption to that of assent. Observation teaches that men are not tardy in pursuing their rights, and in availing themselves of all things which they regard as tending to promote their interests. And after such a deed is made and recorded, we would naturally suppose that if creditors regarded it to their interest, and assented to its provisions, they would not delay any great length of time until they would endeavor to render the fund

26—50TH ILL.

availing. Such is usual with human action. We must there-
fore conclude, when the creditors, as in this case, had remained
inactive and taken no steps to subject the property to the pay-
ment of their debts for nearly eight years, and never claimed, or
gave notice that they would claim, its benefits, and at the end of
that time the parties, by a deed duly recorded, declared the
trust revoked, and the creditors took no steps to subject the
property for thirteen or fourteen years longer, that they never
did assent, and that the revocation was properly made. Such
inaction surely overcomes all presumption of assent, and no
person would contend that the parties might not cancel in
the absence of consent of creditors.

It may be, that the inaction of the creditors for seven years,
nine months and a half, which elapsed before the revocation,
would be effectual to rebut the presumption of assent, but it
is not necessary to the decision of this case to so hold, as even
if the revocation could not have been avoided on the ground
that their assent had been given, still we must conclude that
from the long period that elapsed after the revocation the
creditors had ratified it. This is as reasonable a presumption
as that the creditors had assented to the assignment, and is
entitled to fully as much weight.

To raise this trust we have to pursue the money paid by King
on these and other lots, to the property in controversy through
the arrangement made under the act of the legislature, into the
hands of Eldridge, in whom the fee vested. King having no
title when he made the assignment, it only became a result-
ing trust when deeded to Eldridge. In such a case, a period
must arrive when property thus situated, shall become free
from such burthens; a time when courts will presume that
those in whose favor it has resulted have released and dis-
charged the property from its operation. Had King owned
the title when he executed the deed of assignment to Eldridge,
and had he named the creditors in the deed or schedules
attached, it may be that other principles might apply. But
that question is not now before the court and its determination

is unnecessary. In such a case we do not now pretend to say how far such a presumption would be indulged.

The interests of society, require that property should not be fettered for long periods, simply that it may be subjected to the payment of stale demands of doubtful justice—claims presented and urged by persons who are only representing creditors, and who know nothing, and can know nothing, of the state of accounts between the original parties. Had this deed of assignment never been placed upon record, no one would contend that we could presume the assent of the creditors, because it would not be inferred they had notice, but on the contrary, the presumption would be the other way. In such a case we regard it clear, that a revocation would be good; and when the presumption obtains that the assent was not given, or if so, that it was withdrawn, then we must hold the revocation valid and binding. From the great length of time that has elapsed, we must hold that no assent was given, or if it was, that it was withdrawn, and that because, by the unprecedented growth of the great city of the west, together with the improvements placed upon the property, what the creditors regarded as worthless has become of large value, they may not repent and now come in and claim a lien and subject the property to the payment of their debts. We must therefore hold, that the indenture of 1845 was a rescision of the trust, which cannot be questioned by the creditors after permitting nearly eight years before and thirteen or more years to elapse after the rescision, before they claimed under the trust.

In the case of Reynell Coats' Estate, 2 Parsons Select Eq. Cas. 258, it was said that as a general rule of equity, an assignee in trust cannot set up the statute of limitations against his *cestui que trust*; such direct trusts not being within the statute. But the possession of the trust fund in the hands of the trustee or assignee is considered the possession of the *cestui que trust* and is not held adversely to him. But after a delay of twenty years, without creditors moving to subject the trust property to the payment of their debts, the

presumption arises, that they have been paid, and the trust executed so far as respects creditors. And Drysdal's case, decided by the Supreme Court of Pennsylvania, is referred to as supporting the doctrine. See *Agnew* v. *Fetterson,* 4 Penn. St. R. 56. And whether we should give this rule a general application it is unnecessary to determine, but we are disposed to give it force under the circumstances of this case.

These claims do not commend themselves to a court of equity. They are both stale and speculative, and sustained by insufficient proof to create a strong conviction of their justice, as must ever be the case with transactions of such long standing, depending upon the frail memory of witnesses, and where the principal actors, both King and Eldridge, are dead, and no one left who was cognizant of counter claims and demands that may have existed against many of these claims.

On the other hand, Gibson occupies a strong position in a court of equity as a purchaser of the premises, for which he swears to have paid in actual cash over fifty thousand dollars, and from the evidence all it was at the time worth. He purchased all of the claims to the lot which the record disclosed, and as against claims of such a character, natural justice would say that his position should be sustained, unless forbidden by unbending rules of law which prevent the interposition of the chancellor.

From the 9th of January, 1838, till the 15th of October, 1845, seven years, nine and a half months, no steps were taken by Eldridge to execute the trust, or by the creditors to have its provisions carried out. During this long period no steps were taken under the assignment, and when nearly double that period elapsed afterwards before any of these claims were presented, we are irresistibly impelled to the conclusion, that all parties treated the trust as worthless and had abandoned it, and we are strengthened in that conclusion when we now see that the original holders of the claims or their assignees under the bankrupt proceeding are not here presenting or insisting upon their claims, but they are represented by

assignees who have purchased them after they would, under ordinary circumstances, be barred by the statute and are therefore stale, and having abandoned the trust, they cannot now elect, nor can their assignees elect to revive the trust.

In the case of *Harris* v. *Mills*, 28 Ill. 44, it was held that where a note was barred by the statute of limitations, the mortgage given to secure its payment would be held to be barred. That when the principal thing is gone, all of its incidents must go with it, and the mortgage is but an incident to the debt.

In the case of *Pollock* v. *Maison*, 41 Ill. 517, it was held that the mortgage debt being barred under our statute of limitations, in sixteen years, the entry is barred and the right to foreclose is gone; that when the debt, the principal thing, is gone, the incident, the mortgage, is also gone, and then a foreclosure cannot be had in any of the various modes given by the law. Thus it is seen, that although the statute of limitations does not run to bar the entry where the relation of mortgagor and mortgagee exists, still it does run to bar the debt; and if it does in such a case, why not when property is conveyed to a trustee for the benefit of creditors? In principle, there would seem to be no difference. In each case the debtor transfers or conveys property as a security for the payment of debts. In either case they are but a security and nothing more. They do not belong to the class of trusts, to which the law of trusts usually applies, but partake in some respects of their nature and incidents, but not in all of them. Such assignments do not create a pure trust, but only a *quasi* trust, being intended to secure debts, and are not designed to endure for long periods of time like most trusts that are created. Hence no reason is perceived why the statute should be suspended merely to keep a debt alive, intended to be paid out of the trust fund, any more than a mortgage debt or other debt secured by a pledge.

In this case, King required Eldridge to pay the debts named in the schedules annexed to the deed of assignment.

This can only imply that the payments were to be made while they were legal and binding, and not at all events, although subsequently released, or barred by the statute of limitations; and at the end of schedule B, it is provided that Eldridge shall pay any other lawful and just demands against King, not then stated in his indebtedness. This seems to limit the action of Eldridge to lawful indebtedness, and if so, then it became his duty to refuse to pay any unjust demand or claim that might become outlawed by the lapse of time.

Appellees' counsel, however, urge that Gibson is estopped by the allegations of his bill and the *pro confesso* decree rendered thereon, from now resisting the sale of this property for the payment of the debts filed by the assignees of King's creditors. That decree, no doubt, was binding upon all the parties to it to the extent of its adjudication upon, and the finding of the facts, so long as it remained in force. It is, however, a rule of chancery practice, that by filing an amended or supplemental bill, all previous decretal orders are vacated and defendants may answer the original and amended or supplemental bill Such an amended or supplemental bill is held to make a new case and to authorize it to proceed as though a decree *pro confesso* had not been rendered. *Wightman* v. *Powell*, 2 De Gex & Smale, 570; *O'Callagan* v. *Blake*, 9 Irish Reports, 220. In the case of *Vigus* v. *Lord Audley*, 9 Simons, 408, it was held by vice Chancellor Shadwell, that when a bill of revivor and supplemental bill is filed against a person who represents a defendant to the original bill, and a defendant has appeared to but not answered the original bill, and the bill of revivor and supplement prays that the representative of the deceased defendant may answer both bills, he is bound to do so. And in such a case, where a mere bill of revivor is filed, which asks for an answer to the original bill, an attachment will issue against the defendant if he fail to make such an answer.

In the case of *Davis* v. *Buck*, 6 Bevan. 393, it was said, that to obtain the relief which is sought, the original cause

must be re-heard at the time when the supplemental cause is heard; and the whole matter being before the court, the full relief to which plaintiffs may be entitled will be considered; that a supplemental bill thus brought to supply a defect in the pleadings and decree in the original cause, and the decree upon which it is to be obtained on a rehearing of the decree in the original cause, is a supplemental bill in the nature of a bill of review.

In this case the bill of Rees must be held either to be an amendment to Gibson's bill, or it was in the nature of a supplement to that bill. It was filed by a creditor of King, and like Gibson's bill, it sought to subject this property to the payment of his debt and those of other creditors of King. The scope of the two bills was the same, and Rees' bill recited the allegations of Gibson's bill and the various steps which had been taken in the case, and made Gibson and others defendants, and prayed for an answer. This bill manifestly proceeds upon the ground that it was to be answered by the defendants, and we have seen that in such a case the answer should be to both bills. If Rees then supposed that Gibson was precluded from denying the allegations of his bill, why call for an answer. Gibson had then abandoned his bill and would no doubt have dismissed it, as he claimed to have procured the title to the premises free and discharged from the lien, had it not been contrary to the practice, after creditors had intervened and asserted their claims under the *pro confesso* decree. But he answered Rees' bill and asserted that he held an absolute title to the premises in himself, and denied that they were in any manner liable for the payment of the claims which had been exhibited before the master. No objection was made to this answer, but a replication was filed thereto and the case progressed to a hearing.

Had Rees supposed that Gibson was precluded by the decree *pro confesso* from claiming these lots, or from denying that they were liable for the payment of these debts, it is strange that he did not except to the answer, or move to strike it from

the files instead of joining issue upon it. As a general rule, a complainant. can only preserve a *pro confesso* order when an answer has been subsequently filed, by having the answer stricken from the files, for if he receives the answer, he thereby waives the order to take the bill *pro confesso.* 1 Danl. Ch. Pr. 695. According to the practice then, by Rees receiving and replying to Gibson's answer, the decree *pro confesso* was opened and the case stood for trial on the various bills and answers, and in the attitude the pleadings then occupied, the case stood for trial on its merits, as though a rehearing had been granted on a bill of review. The parties by their pleadings under leave of the court, had in effect, placed the cause on a rehearing.

Nor does the *pro confesso* order find that the allegations of the bill are true. It finds that the Eldridges had failed to answer, and finds " The substance of the complainants' bill appearing to be, that one Henry King in his lifetime purchased the lots described in the certificate of purchase executed by the Board of Commissioners of the Illinois Canal," describing them. It proceeds and recites the substance of the bill, and finds the legal title to lot six in block thirty-four, to be in the heirs of Eldridge, and orders them to convey the lots to R. S. Blackwell, to be held on the same trusts as it was held by their ancestor, and he was ordered to sell the lot and make report to the court. It nowhere appears that the court adjudged or found the allegations to be true, or found or declared what the trust was; but from the scope of the decree it is apparent that the court acted upon the supposition that the property was a trust fund to be distributed to any and all beneficiaries who might establish a right to participate in it. But the court does not adjudge that any person was a beneficiary, but took the fund in charge to hold until the claims should be ascertained and established, and referred it to the master to hear proof and determine that question. It did not even in terms find that the proceeds should be so applied, but it is inferred that such was intended.

It is no doubt true under this decree *pro confesso*, that had no claims been established against the fund, on the coming in of the master's report showing that fact, the court would have ordered the property to be re-conveyed to the Eldridge heirs, precisely as it would have ordered any other trust fund to be refunded by a receiver where none of the parties before the court had shown themselves entitled to it.

When the *pro confesso* order was made and all the creditors were allowed to come in and prove their demands, each claimant on filing his claim became an actor and he was not bound or required by law to urge or protect the rights of other claimants. The interest of each was adverse to the claims of all others, and as to them he occupied the position of a defendant, and they that of complainants. *Armstrong* v. *Storer*, 9 Beavan, 277. If any one of the creditors chose, he had the right to question and resist the claims of any or all the others. It was not the duty of Gibson to protect the interest of Rees or any one else; and when Rees made him a defendant, he did not change his position, as Gibson could have resisted Rees' claim as well under the *pro confesso* order, as when a defendant to the supplemental bill, and was not estopped by his decree *pro confesso* from doing so, without any further pleadings, and on a final hearing on the coming in of the master's report, the rights of all the claimants would then have been settled, and not only so, but those of Eldridge's heirs or those claiming under them could have been heard and considered.

In the case of *Fitzhugh* v. *McPherson*, 9 Gill & J. 51, it was held that a decree which ordered the sale of mortgaged premises and its proceeds to be brought into court for distribution, does not settle the rights of the parties to the suit. That the rights of the several mortgagees must be settled on the adjudication in regard to the distribution of the fund. And in the case of *Ridgley* v. *Bond*, 18 Md. R. 433, Fitzhugh's case is referred to and the same rule was applied. When the decree first rendered proceeds no further than to determine whether the property is chargeable with a trust, and so finds,

the court must necessarily, when it comes to apply the fund in discharge of the trust, determine who, if any one, is entitled to participate in its distribution.

The case of *Faunniquet* v. *Perkins*, 16 Howard 82, goes farther and holds, that on the final hearing all interlocutory decrees in the case are open for revision and are under the control of the court. It is there said, that if the court below upon further reflection or examination, changed its opinion after passing the order, it was its duty to correct the error. In that case the court below had found and decreed that the defendant was liable to account with complainant and had referred the matter to the master to hear and state the account and report to the court; and on the coming in of his report, the court dismissed the bill. And in the case of *Consequa* v. *Funning*, 3 Johns. Ch. R. 364, the court rendered a decree in the cause granting the relief asked in the bill, and on the coming in of the answer, defendant petitioned for a rehearing and it was had on the merits. It thus appears that under the old and more strict practice, even after the relief was granted, on a petition, the case could be reheard on the merits, and by the modern practice, on a final hearing, all previously rendered decretal orders are before the court, and may be modified, altered, or vacated, as justice may require. And there seems to be no objection to the latter course, as when the chancellor becomes satisfied that he has committed an error, he should avail himself of the earliest opportunity to correct it and not delay justice by driving a party to his appeal or writ of error.

Rees, by filing his supplemental bill and calling for and receiving answers, as we have seen, opened the whole case for a rehearing, and we now come to consider Gibson's claims to this property. It appears from the record that before Gibson filed his bill, the widow and heirs of Eldridge, senior, sold lot six in block thirty-four to one Zenas Cobb for ten thousand dollars, and gave a bond for its conveyance when the money should be paid. Cobb was not made a party to Gibson's bill, and he of course was not affected by the decree *pro confesso*, nor

was his right to claim as a purchaser thereby cut off or barred. Gibson afterward paid Cobb and received an assignment of this bond, paid the purchase money and received a deed from Eldridge's heirs conveying to him the lot, pending the suit, after the bill was taken as confessed, but before the master conveyed the lot to Blackwell. It thus appears that when the master conveyed on behalf of Eldridge's heirs, they had parted with their title and it had vested in Gibson, and he, and not they, then was the holder of the fee. Then when the decree *pro confesso* was opened, Eldridge's heirs, had they still held the title, could have come in and interposed all of the defenses that might be made in the case, and when Gibson acquired this title, he succeeded to the same right of defense and has interposed it. Gibson also purchased this lot of, and received deeds from the widow and heirs of King, and thus acquired their interests thereto under the agreement of the 15th of October, 1845, thereby uniting in himself all of the title, both legal and equitable, and fully invested himself with a complete defense, which must be allowed.

It appears that King, in his lifetime, conveyed his interest in the east half of lot six in block thirty-eight, to one Amory Gamage. He subsequently brought suit against Eldridge's heirs for a specific performance, which was decreed and the lot was conveyed to him in pursuance to the decree. Parker and Bryan derive title to this lot from Gamage. The title thus passed to and vested in them. They, so far as we can see, are *bona fide* purchasers, in addition to all that has been said in reference to the lot held by Gibson, they must be held entitled to be protected in their rights. All that has been said in reference to the claims of appellees against the other lot applies with equal force to this half lot, and they have established a complete defense; the court therefore did right in dismissing the bill against them as to the east half of lot six in block thirty-eight, and to that extent the decree must be affirmed; but as to the remainder, it must be reversed and the cause remanded.

*Decree reversed in part.*